### AFFIDAVIT OF SPECIAL AGENT GREGORY GERLACH
### IN SUPPORT OF A COMPLAINT AND
### APPLICATIONS FOR SEARCH AND SEIZURE WARRANTS

I, Gregory Gerlach, having been duly sworn, do hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I have been a Special Agent of the Federal Bureau of Investigation ("FBI") since February 2020. I am currently assigned to the FBI's Boston Field Office and to that office's health care fraud squad. I am currently responsible for investigating allegations of health care fraud, through which, I have participated in investigations involving those programs and have interviewed witnesses, conducted surveillance, reviewed claims data and medical records, and reviewed financial and other business records. I received training at the FBI Academy in Quantico, Virginia in a variety of investigative and legal matters. Additionally, prior to my employment with the FBI, I worked for a number of years with the U.S. Department of Justice, including with the Health Care Fraud Strike Force.

2.     I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18 of the United States Code.

### PURPOSES OF AFFIDAVIT

3.     **Criminal Complaint:** I submit this Affidavit in support of a criminal complaint alleging that between approximately February 2021 and the date of this affidavit, Raju SHARMA ("SHARMA") and others (collectively, the "TARGET SUBJECTS") engaged in a health care fraud conspiracy in violation of 18 U.S.C. § 1349 (the "TARGET OFFENSE").

1

4.      **Seizure Warrants**: I further submit this Affidavit in support of applications for seizure warrants for the following assets (the "TARGET ASSETS"), as described in Attachment C:

      a.    A white 2022 Mercedes-Benz Model S with vehicle identification number W1K6G7GB7NA159966 and Massachusetts license plate number RJ555 (the "Mercedes");

      b.    A red 2022 Ferrari Spider with vehicle identification number ZFF93LMA6N0275822 and Massachusetts license plate number RA555 (the "Red Ferrari"); and

      c.    A purple 2024 Ferrari Roma with vehicle identification number ZFF98RNA0R0301534 and Massachusetts license plate number RU555 ("the Purple Ferrari");

      d.    A Rolex Submariner Date, 41 mm watch ("SUB DATE/41/18KY/BLUE"), with serial number 297,457 ("Watch 1");

      e.    A Rolex Datejust, 36 mm watch ("DJ36/SS18Y/OB/CHMP DD/JU"), with serial number 297,283 ("Watch 2");

      f.    A Rolex GMT-Master II, 40 mm watch ("GMTII/40/SS 18Y/GRAY-BLK"), with serial number 298,463 ("Watch 3"); and

      g.    A Patek Philippe 5147G-001 watch, with serial number 273,961 ("Watch 4").

5.      **Residential Search Warrant**: I further submit this Affidavit in support of an application for a search warrant for SHARMA's residence, 5 Saw Mill Pond Road, Sharon, Massachusetts (the "TARGET LOCATION"), including the garage, curtilage, and driveway, as described in Attachment A to the proposed warrant, because there is probable cause to believe it contains evidence, fruits, and instrumentalities of the crime (i.e., the TARGET ASSETS), as described in Attachment C to the proposed warrant.

6.      **Person Warrant**: Finally, this Affidavit is submitted in support of an application for a warrant to search the person of SHARMA, as described in Attachment B, for any TARGET ASSETS, to include the watches identified above.

7.      Based on the facts in this Affidavit, there is probable cause to believe that SHARMA has committed the TARGET OFFENSE, that evidence, fruits, and instrumentalities of the TARGET OFFENSE will be located in the TARGET LOCATION and on SHARMA's person, and that the TARGET ASSETS represent, are derived from, or are traceable to proceeds of a specified unlawful activity, to wit, health care fraud conspiracy, in violation of 18 U.S.C. § 1349, and are accordingly subject to civil and criminal forfeiture and seizure in accordance with 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(7).

8.      I am familiar with the facts and circumstances of this investigation, and I have received information from a variety of sources, including but not limited to other law enforcement officers and agents, confidential sources, court ordered interception of wire communications, and my personal review of records and reports relating to the investigation.

9.      Since this Affidavit is being submitted for the limited purpose of securing the requested criminal complaint and warrants, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to that there is probable cause for the requested complaint and warrants.

## PROBABLE CAUSE

10.      SHARMA is the owner and operator of Pharmagears, LLC ("PHARMAGEARS") and RR Medco, LLC ("RR MEDCO"), which are durable medical equipment ("DME") supply companies. As detailed below, SHARMA also worked with other coconspirators to open and operate at least six other DME companies (together with PHARMAGEARS and RR MEDCO, the "TARGET COMPANIES").

11.      The TARGET COMPANIES are DME suppliers that, collectively, have been billing Medicare for off-the-shelf ("OTS") orthotics (e.g., back braces and knee braces) since approximately February 2021. Based on the investigation to date, I submit that there is probable

cause to believe that TARGET COMPANIES billed Medicare for medically unnecessary DME, which often the Medicare beneficiaries did not want or could not use, and/or a medical practitioner ordered without having met or examined the beneficiary. Moreover, I submit that there is probable cause to believe that the TARGET COMPANIES paid kickbacks to marketing companies to obtain the orders and examination notes for this medically unnecessary DME. As such, there is probable cause to believe SHARMA engaged in a conspiracy to commit health care fraud through, and on behalf of, the TARGET COMPANIES.

## THE MEDICARE PROGRAM

### General Regulations and Requirements

12.    The Medicare program was established under Title XVIII of the Social Security Act. Medicare is a federally funded health plan that provides health care coverage, including coverage of DME and prescription medication, to persons 65 years of age or older and to certain disabled individuals. Individuals who receive Medicare benefits are referred to as Medicare "beneficiaries." The program is administered by the U.S. Department of Health and Human Services ("HHS") and is supervised by the Centers for Medicare and Medicaid Services ("CMS"). Medicare is a health care benefit program as defined by 18 U.S.C. § 24(b).

13.    To become a participating provider in Medicare, providers must agree to abide by the policies, procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, are required to abide by all provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies, procedures, rules, and regulations issued by CMS and its authorized agents and contractors. Health care providers are given online access to Medicare manuals and services bulletins describing proper billing procedures and billing rules and regulations.

4

14.     Specifically, during the enrollment process, the provider must complete a certification in which the provider's representative promises "to abide by the Medicare laws, regulations and program instructions that apply to" the representative and provider, that "payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal Anti-Kickback Statute)," and that the representative would not "knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

15.     Under the Social Security Act, for any item to be covered by Medicare, it must (1) be eligible for a defined Medicare benefit category, (2) be reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, and (3) meet all other applicable Medicare statutory and regulatory requirements. *See* 42 U.S.C. § 1395y.

16.     Medicare regulations require health care providers enrolled with Medicare to maintain complete and accurate patient medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for payment were submitted by the physician. Medicare requires complete and accurate patient medical records so that Medicare may verify that the services described on the claim form were provided. These records are required to permit Medicare to review the appropriateness of Medicare payments made to the health care provider. Medicare providers are required to maintain all records—both hard copy and electronic—that disclose the extent of services provided and significant business transactions for a period of at least six years.

**Orthotics**

17.     Orthotic devices, or orthoses, are DME items that are applied to the outside of the body to support a body part. They are commonly referred to as "braces." Examples of orthotic devices include back braces, knee braces, ankle braces, wrist/hand supports, and arm/shoulder supports.

18.     Section 1847(a)(2) of the Social Security Act defines OTS orthotics as those orthotics, covered by the Act, which require minimal self-adjustment for appropriate use and do not require expertise in trimming, bending, molding, assembling, or customizing to fit to the individual. Orthotics that are currently reimbursed under the Act and are described in the Act are leg, arm, back, shoulder, and neck braces. The Medicare Benefit Policy Manual (Publication 100-2), Chapter 15, Section 130 provides the longstanding Medicare definition of "braces." Braces are defined in this section as "rigid or semi-rigid devices which are used for the purpose of supporting a weak or deformed body member or restricting or eliminating motion in a diseased or injured part of the body."

20.     A claim for DME submitted to Medicare qualifies for reimbursement only if it is medically necessary for the treatment of the beneficiary's illness or injury and prescribed by a licensed physician, nurse practitioner, physician assistant, or clinical nurse specialist.  Specifically, the Medicare beneficiary's treating practitioner must provide a written prescription or order that documents the need for the DME.

21.     To receive reimbursement from Medicare for items such as OTS orthotics, a DME supplier is required to submit a claim, either electronically or in writing, through standard forms, either the Form CMS-1500 or UB-92. Both of these claim forms require important information, including: (a) the beneficiary's name and identification number; (b) the name and identification number of the referring/ordering provider who ordered/prescribed the OTS orthotics; (c) the health

care benefit item that was provided or supplied to the beneficiary; (d) the billing codes for the specified item; and (e) the date upon which the item was provided or supplied to the beneficiary. Each time a DME supplier submits a claim to Medicare, the supplier certifies that the claim is true, correct and complete, and complies with all Medicare laws and regulations.

22.     The DME supplier is required to maintain the written order from the treating practitioner, as well as the supporting documentation from the treating practitioner. *See* Medicare Program Integrity Manual (Publication 100-8), Chapter 5, Section 5.4.2.

23.     A Local Coverage Determination ("LCD") is a decision made by a Medicare Contractor on whether a particular service or item is reasonable and necessary, and therefore covered by Medicare within the specific region the contractor oversees. *See* § 1869(f)(2)(B) of the Social Security Act.

24.     According to LCD L33318, in place nationally for services performed on or after October 1, 2015, knee braces, including those billed under Healthcare Common Procedure Coding System ("HCPCS") codes L1833, L1843, L1845, L1851, and L1852, require an examination of the patient and objective description of joint laxity. Claims are not reasonable and necessary if only pain or a subjective description of joint instability is documented.

25.     According to LCD 33790, back braces, including those billed under HCPCS codes L0631, L0637, L0639, L0648, L0650, and L0651, are covered only when they are ordered: (1) to reduce pain by restricting mobility of the trunk; (2) to facilitate healing following an injury to the spine or related soft tissues; (3) to facilitate healing following a surgical procedure on the spine or related soft tissue; or (4) to otherwise support weak spinal muscles and/or a deformed spine.

## ANTI-KICKBACK STATUE

26.     The Anti-Kickback Statute ("AKS") generally prohibits knowingly offering, paying, soliciting, or receiving remuneration (*i.e.*, anything of value) in return for (i) referring an

individual to a person for the furnishing or arranging for the furnishing of any item for which payment may be made in whole or in part under a federal health care program or (ii) purchasing, ordering, or arranging for or recommending purchasing or ordering any item for which payment may be made in whole or in part under a federal health care program. 42 U.S.C. § 1320a-7b(b).

## THE FRAUD SCHEME

### Overview

27.    By late 2021, HHS-OIG and the FBI had opened an investigation into SHARMA and his company PHARMAGEARS for submitting, and causing to be submitted, fraudulent claims to Medicare for DME. Further investigation revealed that SHARMA also owned and operated another DME company, RR MEDCO.

28.    As detailed below, the investigation has revealed that SHARMA was using his companies to submit fraudulent claims to Medicare for DME that were neither medically necessary nor wanted by the Medicare beneficiary receiving the items, and has further revealed that the companies' orders were tainted by illegal kickbacks because SHARMA paid marketing companies on a "per lead" basis for the DME orders he submitted to Medicare.

29.    The investigation further revealed that SHARMA enlisted family members, friends, and acquaintances (including trade workers who were conducting renovations of his home) to open and operate additional DME companies in the same fraudulent manner as SHARMA had been operating PHARMAGEARS and RR MEDCO. For these additional companies,[1] SHARMA ostensibly served as a paid "consultant" and was paid a fee as well as a percentage of profits from these new companies. SHARMA assisted in opening the new companies, including by facilitating the Medicare enrollment process and connecting the new companies to the same marketers,

---

[1] I am aware of the identity of these companies but am withholding the names from this Affidavit as the investigation remains ongoing.

suppliers, and billers that he used. SHARMA also instructed the new companies how to pay the marketers per lead for the same types of fraudulent orders all while obscuring these illegal payments with sham invoices and/or sham contracts with the marketers.

30.     For all of the TARGET COMPANIES, the investigative team has developed substantial evidence through witness/beneficiary interviews, document requests to various medical practices, reviewing records produced in response to legal process, and a variety of other investigative methods showing that SHARMA and his coconspirators caused fraudulent claims to be submitted to Medicare; that SHARMA profited substantially from those improper orders; and that he used the proceeds of his offenses to purchase luxury goods, including the TARGET ASSETS.

## PHARMAGEARS

31.     PHARMAGEARS, which operated out of Suite 221 of an office building located at 1600 Providence Highway in Walpole, Massachusetts, is owned by SHARMA. SHARMA enrolled PHARMAGEARS in Medicare in or around December 2020 and began billing Medicare for OTS orthotics in February 2021.

32.     As a result of credible allegations of fraud, CMS initiated a payment suspension on PHARMAGEARS in September 2022. Medicare enrollment records indicate that subsequently, PHARMAGEARS withdrew from Medicare in or around December 2022. Prior to withdrawing, PHARMAGEARS billed Medicare approximately $2.8 million for OTS orthotics and was paid approximately $1.07 million for this equipment.

## RR MEDCO

33.     RR MEDCO, which operated out of Suite 285 of the same office building in Walpole as PHARMAGEARS, is also owned by SHARMA. RR MEDCO enrolled in Medicare in or around December 2021 and began billing Medicare for OTS orthotics in August 2022.

34. Despite RR MEDCO and PHARMAGEARS both being owned by SHARMA and operating out of the same office building, the report of Medicare's site visit to RR MEDCO in May 2022 indicates that RR MEDCO staff denied that the company's owner, or any of his relatives, had or have owned any other medical entities.

35. CMS initiated a payment suspension on RR MEDCO in February 2023 based on credible allegations of fraud. Medicare claims data indicates that for dates of service from August 2022 to February 2023, RR MEDCO billed Medicare approximately $1.28 million for OTS orthotics and was paid approximately $547,000 for this equipment.

36. The chart below summarizes the Medicare claims data pertaining to the billing of OTS orthotics by SHARMA's two directly owned companies as of January 28, 2025:

| DME Supplier | Approx. Amount Billed | Approx. Amount Paid | Approx. First Claim Date of Service | Approx. Last Claim Date of Service |
|---|---|---|---|---|
| Pharmagears | $2,795,194.85 | $1,068,283.70 | 1/28/2021 | 12/20/2022 |
| RR Medco | $1,284,434.66 | $547,016.60 | 8/5/2022 | 2/14/2023 |

37. In total, as of January 2025, the TARGET COMPANIES connected to SHARMA billed Medicare approximately $29,603,392 for DME products and were paid approximately $15,836,820.

## PROBABLE CAUSE TO BELIEVE THAT THE TARGET COMPANIES COMMITTED HEALTHCARE FRAUD

### Sampling of Interviews of Medicare Beneficiaries and Referring Providers

38. Along with other investigators, I have conducted numerous interviews of Medicare beneficiaries for whom the TARGET COMPANIES billed Medicare for providing braces. Based on my training and experience, these interviews were consistent with an overall scheme to defraud Medicare, in that the beneficiaries discussed receiving unsolicited phone calls during which the caller asked about their pain and told the beneficiaries they could receive braces free of charge.

10

Braces were then typically delivered to the beneficiaries.  Generally, the beneficiaries reported that the braces they received from the TARGET COMPANIES were unwanted, unnecessary, and/or useless. Moreover, in many interviews, the beneficiaries indicated they did not even know the medical provider who had allegedly ordered the braces for them.

39.    Additionally, along with other investigators, I have interviewed numerous physicians who were identified as the referring providers on the DME claims submitted to Medicare by the TARGET COMPANIES. Generally, the physicians reported that they did not order the DME that was billed and, in many cases, had never seen nor treated the beneficiary for whom they allegedly prescribed DME. I therefore believe the TARGET COMPANIES are fraudulently using physicians' national provider identifiers (NPIs) to facilitate their illegal scheme. Examples related to PHARMAGEARS and RR MEDCO are included below.

## PHARMAGEARS

### Beneficiaries JC and his wife and Dr. BS of Massachusetts

40.    In June 2021, HHSOIG interviewed Medicare beneficiaries JC and JC's wife regarding DME that was delivered to their home and billed to Medicare by PHARMAGEARS around February 2021. Specifically, Medicare claims data indicates that PHARMAGEARS billed Medicare for providing JC a back brace and a knee brace with suspension sleeve and for providing JC's wife a back brace, ankle brace, and heel stabilizer.  JC and his wife confirmed that they received the orthotics from PHARMAGEARS and said that they did not want the equipment and had not used it.

41.    JC and his wife reported that prior to the braces being delivered, they received a call from an unknown caller asking about their health issues and their pain, and then the unknown caller offered to send them braces free of charge. JC and his wife recalled telling the caller they did not want any braces. Furthermore, after the braces arrived, JC's wife recalled calling

PHARMAGEARS and telling the man who answered that she and JC did not want the braces and wanted to return them. JC's wife recalled that the man at PHARMAGEARS told her the braces had already been processed and that she should just hold onto them.

42.     PHARMAGEARS billed Medicare approximately $5,513 for the orthotics it provided to JC and his wife, and Medicare paid PHARMAGEARS approximately $1,975 for the equipment. Dr. BS, an orthopedic surgeon in Massachusetts, was listed as the referring provider on the claims for the braces for both JC and his wife. However, JC and his wife reported that they had never heard of nor seen Dr. BS.

43.     Medicare claims data shows that Dr. BS was listed as the referring provider on PHARMAGEARS DME claims for approximately 28 beneficiaries, including JC and his wife. In total, PHARMAGEARS billed Medicare approximately $57,395 for DME allegedly prescribed by Dr. BS and was paid approximately $22,848.

44.     In August 2021, HHS-OIG sent a request for information ("RFI") to the orthopedic surgery practice where Dr. BS works, requesting copies of any DME orders signed by Dr. BS for these 28 Medicare beneficiaries. The medical records department responded in writing that they had no records of Dr. BS ordering DME for any of the 28 beneficiaries, nor any records of Dr. BS ever seeing these individuals as patients.

45.     HHS-OIG interviewed Dr. BS in September 2021. He reported that since relocating to Massachusetts in 2014, he had not seen nor prescribed DME to any patients outside the orthopedic practice where HHS-OIG sent the RFI. Moreover, Dr. BS reported that he rarely prescribes braces to his Medicare patients. Dr. BS concluded that he did not prescribe DME to any of the beneficiaries identified in the RFI and expressed concern about his NPI having been compromised.

**Beneficiary CH and Dr. CD of Massachusetts**

46.     In July 2021, HHS-OIG interviewed Medicare beneficiary CH regarding the ankle brace, back brace, and heel stabilizer that were delivered to his home and billed to Medicare by PHARMAGEARS around May 2021. CH reported that prior to the delivery of the braces, he received a phone call from a man who asked about his medical conditions. The caller said he would send CH braces to help with his pain and said that CH had to accept the braces or CH would lose his Medicare coverage. CH admitted he provided his Medicare number to the caller. After the equipment arrived, CH received another call to confirm delivery, and the caller told CH that he was renewing CH's Medicare number.

47.     CH did not want the orthotics he received from PHARMAGEARS and reported that he gave the equipment away by leaving it in the entryway to his apartment building for anyone to take.

48.     PHARMAGEARS billed Medicare about $2,441 for the orthotics it provided to CH, and Medicare paid PHARMAGEARS about $1,160 for the equipment. Dr. CD, an orthopedic surgeon who worked in Massachusetts until July 2021, was listed as the referring provider on the claims for the orthotics for CH. However, CH reported that he had never heard of Dr. CD.

49.     Medicare claims data shows that in April and May 2021, Dr. CD was listed as the referring provider on PHARMAGEARS DME claims for approximately 13 beneficiaries, all of whom resided in Massachusetts, including CH. In total, PHARMAGEARS billed Medicare about $13,062 for the DME allegedly prescribed by Dr. CD and was paid about $10,389.

50.     In July 2021, HHS-OIG sent an RFI to the health system where Dr. CD practiced orthopedic surgery until July 2021. The RFI requested copies of any DME orders signed by Dr. CD for the 13 Medicare beneficiaries. Additionally, the RFI asked for a signed statement if there were no such orders and/or no records of Dr. CD seeing the individuals identified in the RFI. The

medical records department responded with a signed, written statement that they had no records responsive to the RFI.

51.    HHS-OIG then interviewed Dr. CD later in July 2021. He reported that for the previous twelve years and until leaving Massachusetts for New York in July 2021, he had not seen patients outside the health system where HHS-OIG sent the RFI. Moreover, Dr. CD reported that he treats the spine and could guarantee that he had not prescribed ankle, knee, or wrist braces to any patients in April and May 2021. The Medicare claims data shows that PHARMAGEARS billed for Dr. CD ordering two knee braces, two ankle braces and four wrist braces amongst other orthotics. Dr. CD concluded that if the health system where he had worked for twelve years did not have any records of him treating the 13 Medicare beneficiaries, then they were not his patients, and he did not prescribe DME for them.

### PHARMAGEARS Records

52.    In October 2021, agents obtained records from PHARMAGEARS pertaining to DME claims the company had submitted to Medicare. The investigation indicates that the records included fraudulent medical records, showing that doctors had examined patients, recommended DME as being medically necessary, and signed corresponding DME orders when in fact the doctor and patient had no relationship and the doctors never ordered DME for the patients.

### RR MEDCO

### Beneficiary DS and Dr. JB of Georgia

53.    In April 2023, HHS-OIG interviewed LS, the daughter-in-law of Medicare beneficiary DS, regarding a hotline complaint that LS filed with HHS-OIG. LS reported that back and knee braces, addressed to DS, were delivered to LS's home. The braces were from RR MEDCO. LS explained that her mother-in-law resides in an assisted living facility, though LS's home address is listed as the home address for her mother-in-law. LS reported that the braces are

unwanted and not needed by DS. LS explained that DS has dementia and LS suspects that RR MEDCO and other providers were taking advantage of her mother-in-law, as Medicare had also been billed for laboratory tests and other medical services that DS did not need and/or receive.

54.    Specifically, Medicare claims data indicates that RR MEDCO billed Medicare about $3,541 for providing DS with a back brace and two knee braces with suspension sleeves around October 2022 and Medicare paid RR MEDCO about $2,020 for this equipment. Dr. JB, a nephrologist in Georgia, was identified as the referring provider on these DME claims. However, LS reported that she and her husband had never heard of Dr. JB and therefore she did not believe DS was a patient of Dr. JB.

55.    In May 2023, HHS/OIG interviewed Dr. JB regarding any DME orders he may have signed for DS. Dr. JB reported that medical records for his nephrology practice show that beneficiary DS was last seen at the practice in 2011. Dr. JB added that even at the visit back in 2011, DS was seen by a different doctor at the practice. Moreover, Dr. JB reported that he rarely ordered DME for his patients. Dr. JB then provided HHS/OIG with a signed statement reporting that DS was previously followed at his practice by one of his partners and that DS last seen at the practice in 2011. In his signed statement, Dr. JB also reported that there were no records of him ever attending DS or ordering DME for her.

### Beneficiary WE and Dr. LA of Mississippi

56.    In September 2022, HHS-OIG interviewed Medicare beneficiary WE, who reported that he received a back brace and two knee braces from RR MEDCO. WE stated that days prior to the braces being delivered, he received a phone call during which the caller asked WE about any pain he was having. WE told the caller that he had lower back and knee pain. The caller asked for WE's Medicare number and told WE that he would be receiving back and knee braces in the mail free of charge.

15

57.     Medicare claims data indicates that RR MEDCO billed Medicare about $3,683 for providing WE with a back brace and two knee braces with suspension sleeves around August 2022 and Medicare paid RR MEDCO about $2,245 for this equipment. Dr. LA, an internist in Mississippi, was identified as the referring provider on these DME claims. However, WE did not recognize Dr. LA's name.

58.     By January 2023, Medicare claims data showed that Dr. LA was listed as the referring provider on RR MEDCO claims for OTS orthotics for 4 beneficiaries, including WE. The claims data also showed that by January 2023, PHARMAGEARS and one of the other TARGET COMPANIES had submitted claims for OTS orthotics for 28 additional beneficiaries with Dr. LA identified as the referring provider. In total, RR MEDCO, PHARMAGEARS, and the third TARGET COMPANY billed Medicare about $79,206 for the DME allegedly prescribed by Dr. LA and were paid about $37,737 for this equipment.

59.     In January 2023, HHS-OIG sent an RFI to the medical practice where Dr. LA works, requesting copies of any DME orders signed by Dr. LA for these 32 Medicare beneficiaries. HHS-OIG then interviewed Dr. LA regarding the RFI and DME prescribing in general.

60.     Dr. LA reported that a review of the electronic records for the practice where she works, as well as the hospital and nursing homes where she also sees patients, showed that none of the 32 beneficiaries identified in the RFI were patients of these medical facilities. Accordingly, Dr. LA concluded that these 32 beneficiaries were not her patients, and that she did not order DME for them. Dr. LA also provided a signed statement to this effect in January 2023. In the interview, Dr. LA noted that she could not recall the last time she prescribed OTS orthotic equipment for a patient. Moreover, Dr. LA indicated that if she ever prescribed DME to a patient, the patient would get the DME in-house or from a local, reputable vendor and not from an outside vendor, such as RR MEDCO or PHARMAGEARS.

**PROBABLE CAUSE TO BELIEVE THE TARGET COMPANIES' ORDERS ARE TAINTED BY ILLEGAL KICKBACKS**

61.     The orders submitted to Medicare by SHARMA and his TARGET COMPANIES were not only fraudulent, but also tainted by illegal kickbacks because SHARMA paid marketers for each order (or on a per lead basis), in violation of the Anti-Kickback Statute.

62.     In May 2022, SHARMA was interviewed by members of the investigative team and provided a list of marketing companies with which he worked. SHARMA explained that he obtained DME orders for specific patients from these marketing companies. Once PHARMAGEARS or RR MEDCO fulfilled the orders by sending the DME to the patients, PHARMAGEARS or RR MEDCO submitted claims to Medicare for the DME.

63.     SHARMA reported that he had written contracts with all the marketing companies with which he worked.  I have obtained and reviewed several of these contracts during the course of this investigation. These written contracts, on their face, indicate that SHARMA was paying a fixed fee for their services in a manner that does not "*take[] into account the volume or value of any referrals or business otherwise generated between the parties*."

> **"Fixed Fee"**:
>
> As compensation for all Services rendered by Contractor under this Agreement, Company shall pay to Contractor fixed and set in advance Service Fees as set forth below. The Service Fees are not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties.
>
> The fair market value flat fee Service Fee amount shall be $4,000 per week.

64.     Notwithstanding these contracts, based on the investigation, including SHARMA's own admissions, SHARMA was actually paying the companies on a per lead basis.

65.     During his interview, SHARMA acknowledged the fact that he paid all the marketing companies from which he was obtaining DME orders on a per lead basis. SHARMA

confirmed that he had this arrangement with all the marketing companies identified on the marketing companies list that he turned over during the interview.

66.    The electronic evidence obtained during the course of this investigation, including emails and business records, confirms that SHARMA in fact paid for DME orders on this per lead basis.

67.    For example, SHARMA emailed his standard contract, including the fixed fee language described above, to Marketer A[2] on September 19, 2021, and told the marketer to sign the contract and send it back to SHARMA.

68.    Only a few minutes after emailing the proposed contract to Marketer A, SHARMA sent the following, separate, email to the same marketer with the subject: "Rates."

| From: | Raju Sharma <rajush1225@gmail.com> |
|---|---|
| Sent: | Sunday, September 19, 2021 10:45 PM |
| To: | ▮▮▮▮▮@gmail.com |
| Subject: | Rates |

▮▮▮

In Aug end you had agreed with ▮▮▮ vey low rates so why are you charging me more---

Came to know back L0650 not more then 300, L0648 BACK 250
L1851 KNEE WITH L2397 SLEEVE 175
L1833 KNEE WITH L2397 SLEEVE 150
I3915/I3916 wrist 125
ELBOW 125
SHOULDER SLING 50
L1906 ANKLE WITH I3170 heel cup 50

CANNOT DO L3960 SHOULDER AND L1971 ANKLE

CGM WE AGREED 180$ EACH

Any patient returns, delivery not accepted, medicare does not pay whatever reason all those leads costs will be adjusted against future payments.

First two weeks transition period to see payments coming in after that weekly payment for the leads submitted in that week M-F then payment next M.

Thanks

Raju

69.    This second email to Marketer A demonstrates what SHARMA told the investigative team in May 2022, that is, that SHARMA did not abide by the written contract that

---

[2] I am aware of the identity of Marketer A, and other marketers with which SHARMA worked, and am withholding the names because the investigation remains ongoing.

PHARMAGEARS had with marketing companies. He did not pay a fixed fee, but rather paid these companies on a per lead, or per order, basis. In particular, SHARMA negotiated with the marketing companies to pay a certain rate for different types of DME orders (e.g., $250 for an order for a back brace and $175 for an order for a knee brace with suspension sleeve).

70.     The orders SHARMA purchased from the marketing companies were for specific Medicare beneficiaries. As this email demonstrates, if Medicare did not pay the DME claim that was generated from the order provided by the marketing company, then SHARMA stipulated that the cost he paid for that lead/order would be adjusted against his future payments to the marketer. Accordingly, as he reported doing with about a dozen other marketing companies, SHARMA, through PHARMAGEARS, was paying the marketers for referrals, in violation of the AKS.

71.     In his May 2022 interview with investigators, SHARMA acknowledged that by December 2021 or January 2022, he knew it was wrong to pay marketing companies on a per lead basis. However, he also reported that from discussions with other DME companies and marketing companies, paying per lead was what was "going on." During the May 2022 interview, SHARMA never claimed to have changed his practice of paying marketing companies per lead. Instead, he reviewed the list of marketing companies and confirmed that he paid each on a per lead basis despite having a written contract with each company that suggested he was paying the company a flat fee.

72.     While SHARMA claimed that he did not realize that paying per lead was wrong until December 2021 or January 2022, SHARMA's emails suggest he was aware that this practice was "not legal" months earlier. In September 2021, SHARMA sent the following email to a marketing company explaining that the marketing agreement cannot reflect that PHARMAGEARS would pay on a per lead basis because that is "not legal;" rather, the contract should reflect payment of a flat fee for "marketing service charges," and that they would "work out the leads cost payout

on a separate sheet." I believe this email captures the essence of SHARMA's scheme to use sham contracts to cover the kickbacks he was in fact paying.

> On Thu, Sep 2, 2021 at 7:48 PM Raju Sharma <rajush1225@gmail.com> wrote:
> ▇▇▇▇ i think you can't put prices of each brace then it shows I am buying leads for a cost which is not legal instead you should put marketing service charges of $4000 per week and we work out the leads cost payout on a seperate sheet. All marketing agreements i have in place are on the same lines bec medicare wants to ensure DME pays as per the marketing service charges mentioned in the agreement and we can't mention per brace price
>
> Warm Regards.
>
> Raju Sharma
> Pharmagears LLC

73.    On September 3, 2021, the marketing company responded to SHARMA (rajush1225@gmail.com) with:

> Raju,
> Thank you for catching this. You are correct, an updated agreement will be sent momentarily.
> Best,
> C

74.    Later that day, SHARMA sent an email in which he requested the amended contract (with the prices for braces removed) and proceeded to negotiate the price he should pay for different braces based on the *"payout"* he would get from Medicare when he bills for the braces:

> Please send amended contract , the knee price mentioned in your contract is 200$ which is acceptable and correct however in cases like :
>
> L1833 KNEE WITH SLEEVE the cost should be 175$ as in payout it is 100$ less compared to L1851 KNEE WITH L2397 SLEEVE
>
> Similarly L1906 ANKLE WITH heel cup L3170 pays only $110 SO THIS LEAD COST CAN'T BE MORE THAN 50$.
>
> Also shoulder sling L3670 PAYS ONLY 90$ SO LEAD COST MAX 40$
>
> Back L0650 pays more than L0648 a 100$ payout diff so lead cost for L0648 should be max 325$.
>
> We should do a mix of braces to avoid audits.
>
> As discussed any returns will be adjusted because for every return I have a loss of 50$ in terms of shipping costs, return label costs and restocking 10% fee depending on the material cost
> If medicare pays zero for a particular patient the that lead cost will be adjusted and also I will have to send a return tag to the patient and pay restocking fees avg 50$ cost.

75.     The L codes (e.g., L1833, L1851) in the email are the HCPCS codes that PHARMAGEARS uses to bill Medicare for the different braces, such as L1833 and L1851 for different types of knee braces. Not only does this email suggest that SHARMA is negotiating the price he would pay for various DME prescriptions based on how much Medicare would reimburse for the specific item prescribed, but it also references SHARMA's expectation that marketing companies would adjust costs if Medicare denies a claim for a brace that was generated from the marketing company's lead. This arrangement illustrates SHARMA's intent was to purchase only orders for orthotics that will be paid for by Medicare, a practice prohibited by the AKS.

76.     Additional electronic evidence confirms that after January 2022 when SHARMA knew it was illegal to pay per lead, and even after May 2022 when SHARMA admitted to investigators that he knew it was illegal, SHARMA nevertheless persisted in paying marketers for DME orders on a per lead basis and submitting those claims to Medicare.

77.     Financial records for PHARMAGEARS show that from January 2021 *through October 2022*, PHARMAGEARS paid approximately $285,000 to individuals and entities identified on the marketing companies list that SHARMA provided during the May 2022 interview.

78.     Also, after Medicare initiated the payment suspension on PHARMAGEARS in September 2022, SHARMA continued to bill Medicare for OTS orthotics through his new DME company, RR MEDCO. Again, RR MEDCO did not enroll in Medicare until around December 2021 (when SHARMA knew it was illegal to bill on a per lead basis) and began billing Medicare for OTS orthotics in August 2022 (after he admitted to investigators that he knew it was illegal). Between *August 2022 and February 2023*, RR MEDCO billed Medicare approximately $1.28 million for OTS orthotics and was paid approximately $547,000 for this equipment, all while financial records for RR MEDCO show that SHARMA continued to make payments to the same

marketing companies.  Based on this, there is probable cause to believe that most, if not all of RR MEDCO's claims were tainted by illegal kickbacks.

79.     In addition to continuing to pay marketers on a per lead basis himself, I believe SHARMA also instructed his family members and friends who owned the other TARGET COMPANIES to pay marketers in the same illegal manner. As explained below, electronic evidence demonstrates that SHARMA is closely connected to, and involved in the operation of, the other TARGET COMPANIES, and bank records show SHARMA received substantial payments from each company and/or its owner(s).

80.     According to email evidence I have reviewed, SHARMA introduced his coconspirators who owned the other TARGET COMPANIES to the same marketers he used with PHARMAGEARS and RR MEDCO. SHARMA also sent his coconspirators the same contract he used with PHARMAGEARS and RR MEDCO for them to use with the marketers. For example, in March 2022, SHARMA sent his daughter and son-in-law his standard marketer contract with the subject line "marketing agreement and spreadsheet you need to send to all mktg companies" and directed them to add their company name "whererever Pharmagears LLC is mentioned and add your co address and signatures" before sending the contract to the marketer.

81.     The bank records also show that each of the TARGET COMPANIES has paid some of these same marketing companies. For example, financial records show that on or around May 2, 2022, the DME company owned by SHARMA's daughter and son-in-law wired $25,455 to one of the same marketing companies paid by PHARMAGEARS. The payment reference for this transaction was "Payment For Leads From Mar 29th To Apr 11th." Additionally, financial records show that from April through August 2022, the company owned by SHARMA's daughter and son-in-law transferred over $145,000 to three other marketing companies to which SHARMA made payments through PHARMAGEARS and RR MEDCO. Based on the investigation to date, I

22

believe that SHARMA's son-in-law and daughter also paid these marketers on a per lead basis because SHARMA taught them how to bill in this manner.

82.     I have also reviewed emails in which SHARMA's daughter and/or son-in-law—like SHARMA—calculated their payments to marketing companies based on paying a certain rate for different types of DME orders and stated that they did not pay for orders which were not reimbursed by Medicare. For example, on April 27, 2022, SHARMA's son-in-law emailed a marketer with the subject line "Cost breakdown."

> Hope you are well! Thanks for sending us the leads, great work.
> In the attached sheet, the ones highlighted in red are returns and the ones highlighted in orange are denied by Medicare.
> Let me know if I missed anyone. If everything looks fine, I will transfer tomorrow.
> Kind regards,

83.     The spreadsheet attached to this email included multiple tabs. Two tabs included information regarding the orders generated by the marketers—one tab for March 2022 and one tab for April 2022— including beneficiary information, as well as which DME products were ordered for each beneficiary. As depicted below, these spreadsheets also included a column titled "marketing cost" with a round dollar figure, which were then totaled for each month. These totals *exclude* orders which are highlighted in accordance with the cover email—that is, excluding the red highlighted orders that were returned and orange orders that were denied by Medicare.



| | A | B | C | D | E | F | G | H | I | J |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Health Care Service Date | Patient/Customer Name | Service Type | Marketing Company | Brace Type 1 | Brace Type 2 | Brace Type 3 | No of Units | Marketing Cost | Marketing Cost Note |
| 2 | 3/29/2022 | | DME | Fairfax | Back Brace (L0650) | | | 1 | $ 275.00 | |
| 3 | 3/29/2022 | | DME | Fairfax | Back Brace (L0650) | Wrist Brace (L3916) | | 2 | $ 350.00 | |
| 4 | 3/29/2022 | | DME | Fairfax | Back Brace (L0650) | Knee Brace (L1851) | Suspension Sleeve (L239 | 5 | $ 625.00 | |
| 5 | 3/29/2022 | | DME | Fairfax | Knee Brace (L1833 | Suspension Sleeve (L2397) | | 4 | $ 300.00 | |
| 6 | 3/29/2022 | | DME | Fairfax | Knee Brace (L1833 | Suspension Sleeve (L2397) | | 4 | $ 300.00 | |
| 7 | 3/30/2022 | | DME | Fairfax | Ankle Brace (L190C | Heel Cup (L3170) | | 4 | $ - | Claim Denied |
| 8 | 3/30/2022 | | DME | Fairfax | Back Brace (L0650) | Knee Brace (L1851) | Suspension Sleeve (L239 | 5 | $ - | Patient Return |
| 9 | | | | | | | | | | |
| 10 | | | | | | | | Total | $ 1,850.00 | |
| 11 | | | | | | | | | | |

| | Health Care Service Date | Patient/Customer Name | Service Type | Marketing Company | Brace Type 1 | Brace Type 2 | Brace Type 3 | No of Units | Marketing Cost | Marketing Cost | Note |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | 4/4/2022 | | DME | Fairfax | Back Brace (L0650 | Shoulder Pillow (L3670) | | 2 | $ 310.00 | | |
| 3 | 4/4/2022 | | DME | Fairfax | Back Brace (L0650 | Knee Brace (L1851) | Suspension Sleeve (L2397) | 5 | $ - | | Patient Return |
| 4 | 4/4/2022 | | DME | Fairfax | Knee Brace (L1851 | Suspension Sleeve (L2397) | | 4 | $ - | | Patient Return |
| 5 | 4/5/2022 | | DME | Fairfax | Back Brace (L0650) | | | 1 | $ 275.00 | | |
| 6 | 4/5/2022 | | DME | Fairfax | Back Brace (L0650 | Knee Brace (L1851) | Suspension Sleeve (L2397) | 3 | $ 450.00 | | |
| 7 | 4/5/2022 | | DME | Fairfax | Knee Brace (L1851 | Suspension Sleeve (L2397) | | 4 | $ 350.00 | | |
| 8 | 4/5/2022 | | DME | Fairfax | Back Brace (L0650) | | | 1 | $ - | | Patient Return |
| 9 | 4/5/2022 | | DME | Fairfax | Back Brace (L0650 | Knee Brace (L1851) | Suspension Sleeve (L2397) | 5 | $ 625.00 | | |
| 10 | 4/6/2022 | | DME | Fairfax | Knee Brace (L1851 | Suspension Sleeve (L2397) | | 4 | $ 350.00 | | |
| 11 | 4/6/2022 | | DME | Fairfax | Extender | | | 1 | $ - | | Extender |
| 12 | 4/7/2022 | | DME | Fairfax | Back Brace (L0650) | | | 1 | $ 275.00 | | |
| 13 | 4/7/2022 | | DME | Fairfax | Back Brace (L0650) | | | 1 | $ 275.00 | | |
| 14 | 4/7/2022 | | DME | Fairfax | Back Brace (L0650) | | | 1 | $ 275.00 | | |
| 15 | 4/7/2022 | | DME | Fairfax | Back Brace (L0650 | Knee Brace (L1851) | Suspension Sleeve (L2397) | 5 | $ 625.00 | | |
| 16 | 4/7/2022 | | DME | Fairfax | Back Brace (L0650 | Knee Brace (L1851) | Suspension Sleeve (L2397) | 5 | $ 625.00 | | |
| 17 | 4/7/2022 | | DME | Fairfax | Knee Brace (L1851 | Suspension Sleeve (L2397) | | 4 | $ 350.00 | | |
| 18 | 4/7/2022 | | DME | Fairfax | Back Brace (L0650) | | | 1 | $ 275.00 | | |
| 19 | 4/8/2022 | | DME | Fairfax | Back Brace (L0650 | Knee Brace (L1851) | Suspension Sleeve (L2397) | 5 | $ - | | Patient Return |
| 20 | 4/8/2022 | | DME | Fairfax | Knee Brace (L1851 | Suspension Sleeve (L2397) | | 4 | $ - | | Patient Return |
| 21 | 4/8/2022 | | DME | Fairfax | Back Brace (L0650) | | | 1 | $ 275.00 | | |
| 22 | 4/8/2022 | | DME | Fairfax | Back Brace (L0650) | | | 1 | $ 275.00 | | |
| 23 | 4/8/2022 | | DME | Fairfax | Knee Brace (L1851 | Suspension Sleeve (L2397) | | 4 | $ - | | Patient Return |
| 24 | 4/8/2022 | | DME | Fairfax | Back Brace (L0650 | Knee Brace (L1851) | Suspension Sleeve (L2397) | 5 | $ 625.00 | | |
| 25 | 4/8/2022 | | DME | Fairfax | Back Brace (L0650) | | | 1 | $ 275.00 | | |
| 26 | 4/11/2022 | | DME | Fairfax | Back Brace (L0650 | Knee Brace (L1851) | Suspension Sleeve (L2397) | 5 | $ 625.00 | | |
| 27 | 4/11/2022 | | DME | Fairfax | Back Brace (L0650 | Knee Brace (L1851) | Suspension Sleeve (L2397) | 5 | $ 625.00 | | |
| 28 | 4/11/2022 | | DME | Fairfax | Back Brace (L0650 | Knee Brace (L1851) | Suspension Sleeve (L2397) | 3 | $ 450.00 | | |
| 29 | 4/11/2022 | | DME | Fairfax | Back Brace (L0650 | Knee Brace (L1851) | Suspension Sleeve (L2397) | 5 | $ 625.00 | | |
| 30 | | | | | | | | | | | |
| 31 | | | | | | | Total | | $ 8,835.00 | | |

84.    The sum of costs of these individual DME orders ($1,850 + $8,835) is $10,685. Another tab of the spreadsheet for payments reflects that this is the same amount to be paid to the marketer.

| | Date | Service Start Period | Service End Period | Amount | Paid |
|---|---|---|---|---|---|
| 1 | Date | Service Start Period | Service End Period | Amount | Paid |
| 2 | 4/27/2022 | 3/29/2022 | 4/11/2022 | $ 10,685.00 | Unpaid |
| 3 | | | | | |

85.    Based on all of the above, and the investigation to date, I believe SHARMA's daughter and son-in-law also paid marketing companies on a per lead basis for the orders through their DME TARGET COMPANY, and I further believe that they did so because SHARMA worked with them—as well as the owners of the remaining TARGET COMPANIES—to create DME companies which billed Medicare for fraudulent DME orders which were tainted by kickbacks.

86.    Based on all of the above, I believe SHARMA and his coconspirators committed the TARGET OFFENSE.

24

**PROBABLE CAUSE TO BELIEVE THAT THE TARGET ASSETS ARE SUBJECT TO FORFEITURE AND TO BELIEVE THAT THE TARGET ASSETS WILL BE LOCATED WITHIN THE TARGET LOCATION**

87.     Based on all of the above, I have probable cause to believe SHARMA has committed the TARGET OFFENSE. Based on the information below, I also have probable cause to believe that the TARGET ASSETS are subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), because they are property, real or personal, which constitute or are derived from proceeds traceable to a violation of a specified unlawful activity, or conspiracy to commit such offense. In health care fraud schemes, "proceeds" means "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense." 18 U.S.C. § 981(a)(2)(A). Pursuant to 18 U.S.C. § 1956(c)(7)(F), any act or activity constituting a Federal health care offense is a specified unlawful activity.

88.     In addition, I have probable cause to believe that the TARGET ASSETS are subject to criminal forfeiture pursuant to 18 U.S.C. § 982(a)(7), because they are property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of a Federal health care offense. Pursuant to 18 U.S.C. 24(a), a Federal health care offense includes a criminal conspiracy to commit such offense.

89.     There is also probable cause to believe that the TARGET LOCATION contains evidence, fruits, and instrumentalities of the TARGET OFFENSE, including the TARGET ASSETS.

**Seizure Authority**

90.     This Court has authority to issue a civil seizure warrant, pursuant to 18 U.S.C. § 981(b)(2), which states that "seizures pursuant to this section shall be made pursuant to a warrant obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal

Procedure." This Court also has authority to issue a criminal seizure warrant pursuant to 21 U.S.C. § 853(f), as incorporated by 18 U.S.C. § 982(b), which authorizes "the issuance of a warrant authorizing the seizure of property subject to forfeiture under this section in the same manner as provided for a search warrant. If the court determines that there is probable cause to believe that the property to be seized would, in the event of conviction, be subject to forfeiture and that [a restraining order] may not be sufficient to assure the availability of the property for forfeiture, the court shall issue a warrant authorizing the seizure of such property."

**Probable Cause to Believe the TARGET ASSETS are Subject to Forfeiture**

91.    I have obtained bank records for several accounts related to SHARMA, PHARMAGEARS, RR MEDCO, and the other TARGET COMPANIES.  Of relevance to the seizure of the TARGET ASSETS, the following accounts are held or controlled by SHARMA:[3]

| Last Four Digits of Account Number | Account Name | Bank | Signatory | Account Type |
|---|---|---|---|---|
| 7921 | Raju Sharma or Wife[4] | Bank of America | | Checking |
| 0876 | Raju Sharma or Wife | Bank of America | | Savings |
| 7297 | RR Medco LLC | Bank of America | Raju Sharma | Checking |
| 8839 | RM BPO Consulting, LLC | Bank of America | Raju Sharma | Corporate |
| 7571 | RM BPO Consulting, LLC | Citizens Bank | Raju Sharma | Business |
| 7601 | RM BPO Consulting, LLC | Citizens Bank | Raju Sharma | Business |

92.    Based on the investigation to date, and my review of SHARMA's financial records and emails, I believe SHARMA's primary source of income during times relevant to the requested

---

[3] On June 12, 2024, the Honorable Donald L. Cabell, Chief United States Magistrate Judge authorized seizure warrants for bank accounts related to SHARMA and the TARGET COMPANIES, including the BOA7921, BOA0876, and BOA7297 accounts.  24-mj-1353-1355-DLC and 24-mj-1359-1361-DLC.  On June 11, 2024, the Honorable Donald L. Cabell, Chief United States Magistrate Judge also authorized search warrants for email addresses related to SHARMA and several other TARGET SUBJECTS. 24-mj-1329-1340-DLC.

[4] I am withholding SHARMA's wife's name in the interest of privacy and because, based on the investigation to date, SHARMA's wife is not believed to be involved in the TARGET OFFENSE.

warrants was the TARGET COMPANIES. For example, transaction records from Ferrari indicate that when SHARMA was purchasing the Purple Ferrari in April 2024, he disclosed that his occupation was "owner/operator" of RR MEDCO,[5] with an annual salary of $250,000.

93.    According to corporation filings obtained from the Secretary of the Commonwealth of Massachusetts, RM BPO Consulting, LLC was incorporated on or around February 8, 2024 with Sharma listed as the Registered Agent and Manager. Based on a review of financial records and the investigation to date, I believe SHARMA utilized RM BPO Consulting as the entity which received payment from the TARGET COMPANIES owned by SHARMA's coconspirators for SHARMA's purported "consulting" for these entities.

94.    According to financial records reviewed by the investigative team, RM BPO Consulting, LLC previously maintained a Corporate Account with BOA ("BOA8839"). Sharma was the only individual listed on the signature card for BOA8839.

95.    Between February 2024 and April 30, 2024, BOA8839 received approximately $1.133 million in total deposits, of which, approximately $1.070 million consisted of credits from other TARGET COMPANIES involved in this scheme.

96.    Based on the investigation to date, I believe that PHARMAGEARS, RR MEDCO, and RM BPO Consulting are all entities owned and operated by SHARMA as part of this healthcare fraud scheme. I therefore believe that most, if not all, of the funds held or transferred by these accounts represents proceeds of the TARGET OFFENSE. Additionally, because I believe that SHARMA's primary sources of income are the TARGET COMPANIES, and that SHARMA has not had any other major source of income for at least four years, I believe that the funds in his personal accounts represent or are derived from proceeds of the TARGET OFFENSE.

---

[5] The Ferrari form lists SHARMA's employer as "RR MECO LLC." I believe this reflects an inadvertent typographical error.

97.    Based on all of the above, I believe that the funds in SHARMA's personal and business accounts set forth above, the cash withdrawn from these accounts, and the items purchased directly or indirectly through these accounts, are derived from, or are traceable to gross proceeds of a health care fraud conspiracy, in violation of 18 U.S.C. § 1349, and are accordingly subject to civil and criminal forfeiture and seizure in accordance with 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(7).

*The Mercedes*

98.    The Mercedes (with vehicle identification number W1K6G7GB7NA159966) is registered to SHARMA, with a purchase date of July 31, 2022, with a total cash price of approximately $147,428.38.

99.    Financial records from SHARMA's personal Bank of America ("BOA") account number ending in 7921 ("BOA7921") show that on or around August 1, 2022, a $14,000 debit was made to Mercedes-Benz of Westwood. Records from Mercedes-Benz Financial Services ("MBFS") indicate that this debit served, in part, as down payment for the Mercedes.

100.    According to MBFS records, the financing for the Mercedes began on or around July 31, 2022, with a monthly installment amount of $2,499 and a first payment due date of September 15, 2022. Beginning on or about September 15, 2022, the 7927 RR Medco business account ("BOA7297") began making regular payments of approximately $2,499 with a transaction description reading (in part) "MBFS_COM DES: Auto Pay ID:5002245057 INDN:RR MEDCO LLC CO." From in or around September 2022 through in or around February 2024, these debits from the BOA7297 account to MBFS totaled approximately $37,480.

101.    Then, on or about February 20, 2024, approximately $122,631 was transferred from BOA7921 to MBFS. Preceding this payment, BOA7921 had an approximate account balance of $1,899 as of January 28, 2024 - before BOA7921 received a transfer of approximately $200,000

from BOA7297.[6] Finally, records from MBFS verify that the Mercedes was paid in full in February 2024, with a final approximate ACH transfer of $122,631.

102.    Based on the above, I believe the Mercedes was paid for with proceeds of the TARGET OFFENSE.

*The Red and Purple Ferraris*

103.    The Red Ferrari, with vehicle identification number ZFF93LMA6N0275822) is registered to RM BPO Consulting, LLC, with a purchase date of approximately April 19, 2024. According to the purchase contract, the Red Ferrari was purchased from Boch Luxe F., Inc. by "RM BPO Consulting LLC Raju Sharma."

104.    The Purple Ferrari (with vehicle identification number ZFF98RNA0R0301534) is registered to RM BPO Consulting, LLC, with a purchase date of April 10, 2024. According to the purchase contract, the Purple Ferrari was purchased from Boch Luxe F., Inc. by "RM BPO Consulting LLC Raju Sharma."

105.    Both the Red and Purple Ferraris (with last five-digits of their unique vehicle identification numbers) appear on the customer information sheet for SHARMA maintained by Ferrari North America, which indicates that SHARMA is the listed owner of both vehicles.

106.    The total purchase price for the Red Ferrari was $503,363.75 (including financing charges and taxes) and SHARMA put a $299,000 down payment on the vehicle. The remainder of the purchase price was financed.

107.    On or around April 11, 2024, a cashier's check was drawn from BOA8839 in the approximate amount of $250,000. This check was made payable to "Ferrari of New England." Based on my review of financial records in this matter, I have probable cause to believe that this

---

[6] A large portion of these funds were transferred into BOA0876, which is the linked savings account to BOA7921. Then, on or around February 16, 2024, BOA0876 transferred approximately $292,000 back into BOA 7921.

cashier's check served (in part) as a down payment for the Red Ferrari. I believe the remaining $49,000 of the down payment was paid using SHARMA's American Express credit card, which was in turn paid off from BOA8839, as detailed below.

108.    The total purchase price for the Purple Ferrari was $336,346.25 (including financing charges and taxes) and SHARMA put a $100,000 down payment on the vehicle. The remainder of the purchase price was financed.

109.    On or around April 11, 2024, BOA8839 wired approximately $95,000 to Boch Luxe F. Inc. Reflected in the bank-to-bank instructions field for this wire is the following text "/ACC/car down payment." Records received from Ferrari Financial Services, Inc. demonstrate that this wire served (in part) as a down payment for the Purple Ferrari.

110.    In addition to the direct payments made from BOA8839 for the Red and Purple Ferraris, I have probable cause to believe that SHARMA also used BOA8839 to indirectly make payments for the two vehicles. For example, financial records from American Express for SHARMA indicate the following three transactions that occurred around the timeframe when both the Red and Purple Ferraris were purchased. Collectively, these three transactions total approximately $74,000 made payable to Boch Luxe d/b/a Ferrari of New England.

| Date | Amount | Instrument | Payee | Dba |
|------|--------|-----------|-------|-----|
| 03/29/2024 | ($5,000.00) | Amex | BOCH LUXE F. INC | FERRARI OF NEW ENGLAND |
| 04/12/2024 | ($20,000.00) | Amex | BOCH LUXE F. INC | FERRARI OF NEW ENGLAND |
| 04/17/2024 | ($49,000.00) | Amex | BOCH LUXE F. INC | FERRARI OF NEW ENGLAND |

111.    In the month of April 2024, BOA8839 had approximately $102,906 in debits with the following description "AMERICAN EXPRESS DES:ACH PMT". As a result, I believe SHARMA paid for the above American Express Ferrari charges from BOA8839.

112.    Finally, since April 2024, I have observed that BOA8839, and the new financial accounts for RM BPO Consulting, LLC (including Citizens 7571 & Citizens 7601) have recuring debits made payable to the entities that financed the balance of the purchase price of both the Red and Purple Ferraris.

113.    Based on the above, I believe the Red Ferrari and Purple Ferrari were each, and both, were paid for with proceeds of the TARGET OFFENSE.

*The Watches*

Watches 1 and 2

114.    Watch 1 (a Rolex Submariner Date, 41 mm watch, "SUB DATE/41/18KY/BLUE," with serial number 297,457) and Watch 2 (a Rolex Datejust, 36 mm watch, "DJ36/SS18Y/OB/CHMP DD/JU" with serial number 297,283) were purchased from Long's Jewelers on or around April 25, 2024, for a cost of approximately $39,000 (Watch 1) and $21,450 (Watch 2). Including taxes, the total transaction amount was approximately $64,228.

115.    Customer records maintained by Long's Jewelers identify SHARMA as the purchaser, with SHARMA's home address (the TARGET LOCATION) and SHARMA's cellular telephone listed on the sales receipt. Further, the records indicate that an "AMEX" was used as the instrument of payment to complete the transaction.

116.    Records maintained by American Express for SHARMA detail a transaction that occurred on or around April 25, 2024 at "ROLEX BY LONGS" for approximately $64,228.

117.    Finally, payment records maintained by American Express for SHARMA's account note two payments received from BOA8839 (RM BPO Consulting Business Account) on or around April 25, 2024 and May 03, 2024. These two payments totaled approximately $115,000.

118.    Based on the above, I believed SHARMA used proceeds of the TARGET OFFENSE to purchase Watches 1 and 2.

119.    Records produced by Long's Jewelers included the following stock images of Watches 1 and 2, respectively.



Watch 3 and 4

120.    Watch 3 (a Rolex GMT-Master II, 40 mm watch, "GMTll/40/SS 18Y/GRAY-BLK", with serial number 298,463) and Watch 4 (a Patek Philippe 5147G-001 watch, with serial number 273,961) were purchased from Long's Jewelers on or around May 11, 2024, for a cost of approximately $16,450 (Watch 3) and $61,870 (Watch 4). Including taxes, the total transaction amounts were approximately $17,478 and $65,736.

121.    Customer records maintained by Long's Jewelers identify SHARMA as the purchaser, with SHARMA's home address (the TARGET LOCATION) and SHARMA's cellular telephone listed on the sales receipts (with each watch listed on a separate sales receipt). Further, the records indicate that an "AMEX" was used as the instrument of payment to complete the transaction.

122.    Records maintained by American Express for Sharma detail two transactions that occurred on or around May 11, 2024 at "ROLEX BY LONGS" and "LONGS JEWELERS" for approximately $17,478 and $65,736.

123.    Finally, payment records maintained by American Express for Sharma's account note two payments received from BOA8839 (RM BPO Consulting Business Account) on or around May 20, 2024. These two payments total approximately $88,044. As such, I believe SHARMA purchased Watches 3 and 4 with proceeds of the TARGET OFFENSE.

124.    Based on the above, I believe SHARMA used proceeds of the TARGET OFFENSE to purchase Watches 3 and 4.

125.    Records produced by Long's Jewelers included the following stock images of Watches 3 and 4, respectively.



**Probable Cause to Believe the TARGET LOCATION and TARGET PERSON Contain the TARGET ASSETS**

126.    The TARGET LOCATION is SHARMA's primary residence. According to public documents available through the registry of deeds, SHARMA and his wife jointly purchased the TARGET LOCATION in 2006. The TARGET LOCATION is also listed as SHARMA's residence on his Massachusetts driver's license.

127.    I have conducted physical surveillance at the TARGET LOCATION and have observed that it has a two-car garage affixed to the left of the residence, as described in Attachment A to the search warrant.

*The Mercedes*

128.    The TARGET LOCATION is listed as the billing address on file with MBFS for the Mercedes.

129.    HHS-OIG and FBI have conducted physical surveillance of the TARGET LOCATION and have observed the Mercedes parked in the driveway of the TARGET LOCATION on several occasions, including as recently as February 13, 2025. As such, there is

probable cause to believe that the Mercedes will be parked at or within the driveway or garage at the TARGET LOCATION.

*The Ferraris*

130.    The Red Ferrari and Purple Ferrari are both registered to SHARMA's RM BPO Consulting LLC at the business address of 1600 Boston Providence Highway in Walpole, Massachusetts. According to records from the Massachusetts Registry of Motor Vehicles, however, the garaging address for the Purple Ferrari is listed as 5 Saw Mill Pond Road, Sharon, Massachusetts (the TARGET LOCATION). The garaging address for the Red Ferrari is listed on some purchase paperwork as **8** Saw Mill Pond Road, Sharon, Massachusetts, while other Registry records reflect a garaging address of 5 Saw Mill Pond Road. I believe the "8" is a typographical error, and that the Red Ferrari is garaged in the same location as the Purple Ferrari, **5** Saw Mill Pond Road, Sharon, Massachusetts.

131.    Investigators have interviewed several of SHARMA's coconspirators during the course of the investigation, and at least two have told investigators that they observed the two Ferraris parked in the garage at the TARGET LOCATION when the interviewees visited SHARMA's home. One of these individuals observed the two Ferraris parked inside the garage at the TARGET LOCATION in September 2024.

132.    Based on all of the above, I believe the Red and Purple Ferraris will be located within the TARGET LOCATION's garage, driveway, or curtilage.

*The Watches*

133.    Records obtained from Long's Jewelers reflect that the TARGET LOCATION is listed as SHARMA's address on file with the jeweler.

134.    Based on my training and experience, and my involvement in the execution of numerous residential search warrants, I know that individuals typically maintain valuables within

their homes. This is particularly true when those valuable items are wearable objects including jewelry, handbags, and clothing. This is because the owner typically wants to maintain the items close at hand so that they can be worn. When such items are not being worn, I know that individuals often maintain such valuables inside safes, lock boxes, or other locked storage compartments within their homes. As such, I believe one or more of the Watches may be located within the TARGET LOCATION, including within a safe, lock box, or other locked storage compartment within the TARGET LOCATION.

135.    And because the Watches are jewelry designed to be worn on one's person, I believe one or more of the Watches may be located on SHARMA's person at the time of the execution of the warrant for his person.

## CONCLUSION

136.    Based on the information set forth above, there is probable cause to believe that:

a.    SHARMA committed the TARGET OFFENSE: health care fraud conspiracy, in violation of 18 U.S.C. 1349;

b.    The TARGET ASSETS were purchased with proceeds of the health care fraud conspiracy and are subject to forfeiture to the United States in accordance with 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(7); and

c.    Evidence, fruits, and instrumentalities of the TARGET OFFENSE, as described in Attachment C to the proposed warrants, are contained within the TARGET LOCATION, as described in Attachment A or on SHARMA's person, as described in Attachment B.

Respectfully submitted,

Gregory Gerlach

Gregory Gerlach
Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with
the requirements of Fed. R. Crim. P. 4.1 by telephone.

DONALD L. CABELL
Chief United States Magistrate Judge
on 2/18/2025
      Date

36

**ATTACHMENT A**

**DESCRIPTION OF THE PREMISES TO BE SEARCHED**

The premises to be searched is located at 5 Saw Mill Pond Road, Sharon, Massachusetts. As depicted below, the building at 5 Saw Mill Pond Road is a two-story, single family residence with a two-car garage attached to the left side of the residence. The garage is accessible via a driveway which also features a car port on the left side, as depicted below. The front door is accessible via a path from the driveway, and up a few steps. The areas to be searched include the driveway, garage, and the inside of the residence, including any safes, lock boxes, or other locked storage compartments that could reasonably hold jewelry items such as watches.





## **ATTACHMENT B**

**PERSON TO BE SEARCHED**

Raju Sharma, date of birth December 25, 1963, as depicted below.



## ATTACHMENT C

## ITEMS TO BE SEIZED

a.    A white 2022 Mercedes-Benz Model S with vehicle identification number W1K6G7GB7NA159966 and Massachusetts license plate number RJ555 (the "Mercedes");

b.    A red 2022 Ferrari Spider with vehicle identification number ZFF93LMA6N0275822 and Massachusetts license plate number RA555 (the "Red Ferrari"); and

c.    A purple 2024 Ferrari Roma with vehicle identification number ZFF98RNA0R0301534 and Massachusetts license plate number RU555 ("the Purple Ferrari");

d.    Keys and/or key fobs for the Mercedes, the Red Ferrari, and/or the Purple Ferrari;

e.    Cash, currency, or other items of value made or derived from the commission of health care fraud conspiracy by Raju SHARMA or any representative of PHARMAGEARS LLC and/or RR MEDCO LLC.

f.    Jewelry, including but not limited to:

   i.  A Rolex Submariner Date, 41 mm watch ("SUB DATE/41/18KY/BLUE"), with serial number 297,457 ("Watch 1");

  ii.  A Rolex Datejust, 36 mm watch ("DJ36/SS18Y/OB/CHMP DD/JU"), with serial number 297,283 ("Watch 2");

 iii.  A Rolex GMT-Master II, 40 mm watch ("GMTII/40/SS 18Y/GRAY-BLK"), with serial number 298,463 ("Watch 3"); and

 iv.  A Patek Philippe 5147G-001 watch, with serial number 273,961 ("Watch 4").